.  Council may we proceed. OK. Thank you. Go ahead, please. Good morning. May it please the court. Richard Seibert from Gordon and Reese for the appellant, the defendant below, legit script. Judge Koh, nice to see you again. I swear I'm not following you. The appellee's entire brief, the plaintiff below, is premised on two points. And each one is completely wrong. First, they say over and over again that their business is legal. No, it's not. It's completely illegal. Of course, it's not illegal to operate a website. And they've taken excerpts out of context from both Judge Simons and Judge Karas' decisions to that effect. But their website, the way they operate it, the purposes to which it is put, and to which it is intended to be put, very much is illegal. I won't belabor it, but fully 10 pages of our opening brief. Can I ask you a question? Yes. Is it illegal to tell a US customer what the price is for a drug at a foreign pharmacy if that US customer doesn't purchase and import the drug? Is that illegal? In and of itself, it may not be illegal, but that is not this case. This case is, in addition to providing that information, the website also provides a direct link to the foreign pharmacy and customer assistance in dealing with that foreign pharmacy. But the numbers that are in the record of how many times that happens seems relatively small. There's the one instance of the foreign pharmacy having, what, just 3.97% of click-throughs actually resulting in drug purchase and import. And then you have a handful of instances where Pharmacy Checkers is helping a US customer deal with a foreign pharmacy following through on a purchase. So that data seems relatively small. Please let me address each of those. First of all, the one instance presented in the appellee's brief of one pharmacy saying 3.47% of their inquiries resulted in click-throughs was highly misleading. There are 64 foreign pharmacies that had click-throughs out of 71 total. So the vast majority were foreign pharmacies. And what the appellee did in their brief was take one of those 64 and say, oh, they testified in the New York trial, or the New York proceeding, that 3.47%. We don't have another percentage, though, for the other 63 foreign pharmacies, do we? I didn't see one in the record. What is the percentage of the click-throughs that result in a purchase and importation of a drug? 85% of the inquiries about foreign pharmacies resulted in a click-through. And 69.4% or 70%, if you will, of those consumers were US consumers. So you multiply those numbers, 70% times 85%. And what you get is almost 60% of the revenue and the click-throughs for this website were US consumers illegally. I'm sorry. I don't think that answers my question, though, because you just told me that just clicking through is not in and of itself illegal. It's illegal if you buy the drug from a foreign pharmacy and import it. And those numbers don't tell me the number of purchases. Forgive me, Your Honor, that's not what I said. What I said was the appellee providing price comparison information in and of itself is not illegal. But when they go farther, when they provide a link on their website to provide a connection to that foreign pharmacy, that raises an inescapable inference that their website is not only intended to, but does facilitate the illegal importation of drugs. The summary judgment standards don't require this court to check its common sense at the door. It's plain. If you look at the website, how it's set up, how it's operated, and the figures that both Judge Karras and Judge Simon dealt with show that the very purpose of this website is to facilitate illegal importation. They're not some benevolent charity providing information. So what? Pardon? Under Chapter 4 or Section 4 of the Clayton Act, so what? Even if they're facilitating illegal importations, we have cases in the Ninth Circuit that say that the revenue from illegal transactions can be the basis of a Clayton Act trouble damages. I would distinguish those cases, Your Honor, if I may. First of all, a number of the cases simply say that the unclean hands defense is not available. If the defendant says, oh, well, you're doing it too, you, plaintiff, are also involved in an anti-competitive conspiracy. In the Volkswagen case, it was pretty clear what was happening. He was getting a kickback. That was illegal. It was a private wrong directed against the defendant. The Ninth Circuit cases to which... Are we saying that the United States government can't prosecute public wrongs? The government can, but this is not a case where the government did. This is a private antitrust suit. You should bring those up with the government. They're not enforcing the law. But why make a private person enforce the law? Your Honor, if I may, those Ninth Circuit cases are either unclean hands or, well, defendant, you should bring a counterclaim. That is not the issue in this case. What is the issue in this case? The issue here is antitrust injury. There is no right, and the cases hold this, there is no right to operate an illegal business. There's no protected right. And if there's no right to operate an illegal business, then you cannot have antitrust injury. In Calnetics versus Volkswagen, the court refused to give an instruction that the income from the illegal business was to be considered as damages. That was reversed by the Ninth Circuit unanimously. That was in the context of an evidentiary instruction against the background of an unclean hands defense. Again, that is not this case. Why is not this case? Because this case, Your Honor, this is the same legal issue as in Pearl Music from the Central District of California and the Modesto Irrigation District case from this circuit where the plaintiff had no legal right to engage in the first place in the business which it claimed was damaged. Both of those district court cases? I'm sorry, sir? Both of those are district court cases? I believe the Modesto Irrigation District case was the Ninth Circuit. Let me ask your point about it has to be a private wrong against the defendant. It looked like in the two U.S. Supreme Court cases, Kiefer, Stewart, and Permalife and the Ninth Circuit's Calnetics, there were antitrust violations. So those were public wrongs, right? Those were harms to competition. Arguably, Your Honor, but they were both in the context, first of all, they were both in the context of private suits, not public suits. So what was being claimed was a private wrong. And secondly, they were both explicitly in the context of an unclean hands defense where the defendant was saying, oh, well, you're doing it too, and therefore you don't have the right to accuse me of it. Again, this is, I would put to the court that this is a different issue. This is a threshold issue of antitrust injury and therefore antitrust standard. You would agree that the verification for U.S. pharmacies, that's legitimate business, right? I'm sorry, Your Honor, I couldn't hear you. The verification for U.S. pharmacies, that's legitimate business, right? Yes. Okay, so why can't they at least get damages for that? If there's any component of their business that's legal. Well, arguably they could. Arguably they could, and in fact, the second part of the question which Judge Simon certified to this court, and by the way, thank you very much for accepting this interlocutory review. The second part of the question which Judge Simon certified to this court said, well, theoretically, if you don't have standing for the facilitation of illegal conduct, what proportion of the plaintiff's business has to be illegal before they're cut off? And Judge Simon also alluded to that in the arguments on summary judgment from the bench where he said, well, maybe any damages that they could claim from the illegal conduct wouldn't count. So that is one of the questions he has put to this court. I would argue that where the majority of the- What is that in the record? That's still, I mean, I'm still kind of struggling with the same question. I just don't see in the record, if you're saying price comparison itself is not illegal, where is it in the record of how many of those price comparisons lead to an illegal foreign import? May I just grab my- I know you're not reviewing Judge Karas's decision, but his decision from the Southern District of New York had an extensive discussion of that. With all due respect, Judge Simon's order had way more analysis than Judge Karas's. I did look at his- Your Honor, I'm very sorry- Summary judgment and motion to dismiss opinions in New York. Your Honor, I'm- And I didn't see a lot of the same, and obviously there were probably other issues, but I didn't see the same extent of analysis as in Judge Simon's case. Your Honor, I'm very sorry. I'm having a problem hearing you. Oh, I'm sorry. I'm just saying, looking at Judge Karas's motion for summary judgment and motion to dismiss opinion, I don't quite see the extensive analysis that you're referring to, so maybe you can point me to a specific page. Sure. I would point you to one excerpts of the record, 93 through 97. The Judge Karas engaged in an analysis where he found that the largest share of pharmacy checkers' revenue was from click-through fees from U.S. consumers to foreign pharmacies. Right, but you agree that that in and of itself is not inherently illegal, right? I mean, you're not entitled, right, to stop people from just getting information, right? I'm not sure I would agree with that, Your Honor. If, in fact, the operation of the website demonstrably leads to connections with foreign pharmacies, I would argue that the logic is inescapable that the website is, in fact, being used not just for information but to make those connections and to order those illegal importations. As I said, the plaintiff, the appellee, is not some benevolent charity. If they didn't get click-throughs from foreign pharmacies because of those illegal purchases, they'd be out of business in a month. So you're asking us to speculate that the only reason a foreign pharmacy would pay for click-throughs is that they must be doing enough sales to justify the marketing expense. I'm not asking... Is that what this rests on? I'm not asking you to speculate. I'm asking you to use logic and common sense. There is no reason, and certainly none has been offered, for foreign pharmacies to pay the appellee money for click-throughs unless it results in sales. Why would they? There's no reason. A lot of people pay for eyeballs, right? And a lot of those eyeballs do not result in sales. They pay for... So what percentage result in sales? That's really my question because you're asking us to make an assessment of what is the percentage of illegality of this business. Businesses pay for eyeballs because those eyeballs result in revenue, and revenue occurs only from sales. That is inescapable logic, and I would respectfully submit that that's not speculation. That's common sense and logic. The sort of common sense and logic that the Supreme Court in Iqbal, for example, said has to be exercised at the pleading stage. And, Madam Counsel, I have a little bit of concern because I think your argument about illegality here would have pretty potentially significant consequences for a lot of websites where third parties use information and use the information and links that they provide to engage in illegal activity. But putting that aside, I think there is also a question in my mind about whether... There seemed to be some give in the question of whether purchasing drugs from a foreign pharmacy is necessarily illegal. There seemed to be some circumstances under which that wouldn't be considered a violation. They're de minimis, Your Honor. If you... Exists, though, right? They exist, but they absolutely are de minimis, and if I may... Do you have, I mean, other than your word for it, is there evidence in the records saying that doesn't count for a significant portion of the transactions that are happening? There is no evidence in the record to indicate that it accounted for anything in terms of revenue to the appellee, and perhaps that's one thing... Well, whose burden is it to show? Sorry? Whose burden is it to show that this business is fully illegal? It is the appellee's, the plaintiff's, below burden to show antitrust standing, and they cannot do so because there's no antitrust injury here, and if I may respectfully, Your Honor, this is not a case where the website merely provides information, even though arguendo, you could use logic on that one too, this is a case where the website provides information, then provides a link, and the website operator then gets revenues because of those links and because of those click-throughs, and where they actively assist the customers who have problems in effecting those links. This is far more than a website that merely provides information. If I may, Your Honors, I'm not sure I have any time to reserve, but... You're two minutes over, but I'll give you a minute. I'd like to reserve it for rebuttal, please. Sure. Thank you very much. All right, thank you. And if my colleagues have more questions, you can go over a minute. And if my colleagues have more questions, you can go over a minute to answer their questions. Thank you. Good morning, Your Honors, and may it please the Court. My name is Aaron Gott, and I represent Pharmacy Checker, the plaintiff and appellee in this matter. It would contravene Supreme Court and Ninth Circuit precedent for this Court to fashion a new rule that deprives a plaintiff of an antitrust cause of action and immunizes an antitrust defendant when the plaintiff's business is entirely legal. That's what Judge Simon, the District Court, said, and the District Court... How is your business entirely legal? I'm looking at these webpages. It's so clear that you are trying to make foreign pharmaceuticals that are prohibited to be imported into the United States available to U.S. customers. Respectfully, Your Honor, that's incorrect. Pharmacy Checker's business is entirely legal. Pharmacy Checker is not involved in any drug transactions, and it is not illegal, like you said before, and like Your Honors were saying before. So when you facilitate the sale, and then a U.S. customer has problems with their foreign pharmacy, and you facilitate that sale by following up with that foreign pharmacy, you're saying that's not involvement in illegal activity? That's correct, Your Honor. There's big F facilitation, and then there's little f facilitation. Pharmacy Checker has never been found to engage in any sort of big F facilitation, for one thing. And by big F, you mean what? There is actually criminal facilitation of drug importation. And if I could back up and talk a little bit about what is and is not illegal, it's actually, it's not illegal to import drugs. Most drugs, most prescription drugs in the United States are manufactured abroad and imported, usually by the manufacturer, before they're sold. So it is illegal to import unapproved or misbranded drugs. There are exceptions to importing misbranded drugs, and it's actually really easy to qualify for an exception to importing misbranded drugs. The biggest one is that you have to have a prescription. It's supervision by a licensed physician is the biggest exception to it. This is a little bit, we never got to this in the district court below. We did get to this question in the Southern District in New York. It's in the briefing there. It's a regulatory exemption, and a lot of the, a lot of exceptions, as we were just discussing with my colleague, a lot of the exceptions to importation fall under that particular exception. And it's not inescapable logic. But you're saying this was not before the Oregon District Court? Correct. So then why is it appropriate to be raising it now? Well, it just didn't come up because Judge Simon never got to that question. It was in the briefing in New York. If Judge Simon didn't rule on that question, why should we get to it? You shouldn't get to it because that's just not before the court. There's no question about whether or not Pharmacy Checker's business was legal. This is an interlocutory appeal of what Judge Simon ruled on. Right. So why can't you stick with that? Right, Your Honor. That is correct. And based on the record below, there is no basis to find that Pharmacy Checker's business was operating illegally. Judge Simon found- Just so I can understand. So technically the question that Judge Simon certified is if a business is partly legal, maybe partly illegal, does it have any trust standing? So your opposing counsel is arguing, well, that's the wrong question because it's 100% illegal. And is your position that we can't accept that because Judge Simon didn't find that at this stage of the proceedings? There was no finding by Judge Simon of 100% illegality. So that's just not the question before us? No, I'm sorry, Your Honor. That's not what I'm saying. Can we reach the question? Like, can we decide that threshold question on this record or do we need more evidence? If we thought that made a difference, would we have to remand? I think if you thought it made a difference, I think remand would be appropriate, but you could, you do have jurisdiction on a 1292 appeal, an interlocutory appeal. It's supposed to be for controlling questions of law. And I think the idea is you should decide the controlling question of law, but you do have jurisdictions. So you could review a summary judgment decision. Putting aside, yes, we have technical jurisdiction. I guess the question is the record. Yeah. So is the question of whether Pharmacy Checker is 100% illegal or partially illegal turn on facts that are not yet developed in the record or are still disputed? Well, I think Judge Simon lamented the fact that LegitScript didn't present sufficient facts. Well, their argument is that it's your burden to prove standing, statutory standing here, and that it's your burden to prove that you're not 100% illegal, if I understand their position correctly. Yes, Your Honor. LegitScript does have, on summary judgment, as the movement does have the burden of initial production, and we have the burden of persuasion, because it is an element. That's a little bit, because they were the moving party, so the burden is a little bit. And we did produce, or we did, as part of our opposition, did produce our statement, our statement opposing, our statement of material facts, can't remember what the title of the document was, on summary judgment in New York. So we did produce sufficient documents to oppose summary judgment. So we do have a factual record. I don't think LegitScript produced sufficient documents to meet its burden, if that answers the question. Can you drill down on what you would say shows that at least a portion of the activity is legal? I'm sorry, could you ask a question? What would you point to in the record to prove that at least a portion of the activity is legal? All of PharmacyChecker's activity is legal, because PharmacyChecker's not involved in any drug transaction, period, Your Honor. PharmacyChecker provides links to websites. PharmacyChecker does not involve, once a customer, a user of its website, clicks on a link, it goes to that website, PharmacyChecker has no visibility into what happens after that. It's gone. What about the assertion that PharmacyChecker will facilitate if there's a problem, if the person clicking through has a problem with their transaction with the foreign pharmacy? As Judge Simon observed in his opinion, there are, I think, three examples over a 15 or 20 year period that were identified in the record where somebody had contacted PharmacyChecker customer service and had said, can you help me with this? And PharmacyChecker doesn't verify whether or not that person actually clicked from a PharmacyChecker link. They will contact that pharmacy that's credited through PharmacyChecker's program and say, hey, this person says that they ordered something from you. Can you help remedy the problem? Because PharmacyChecker doesn't want the pharmacies that it accredits as a safe pharmacy that's responsive to the people that order things from them to be ripping people off. That's what it's, it doesn't want people to be ripped off, and it wants people to be safe. You're not challenging that those three examples involve foreign drug sales facilitated by PharmacyCheckers, are you? Not challenging that they, I mean, it's hearsay, I mean, we assume that that probably happened, but we don't know whether or not it did. We didn't verify any of it. We know that the customer contacted PharmacyChecker and we contacted the pharmacy to say, can you take care of this person? We don't know what the ultimate result was, whether or not, you know, whether or not their importation actually occurred, whether or not a subsequent importation occurred, or whether or not that importation was illegal, because it could have been that that drug was not imported. But you know that that sale happened through the connection made by PharmacyCheckers, right? We don't know that, Your Honor. We know that it's likely that it did, but we don't know that it actually did. All we know is that we got contacted. You just helped anybody. Well, there's no way to verify, there's no way to verify it. PharmacyChecker, well, anybody that contacts PharmacyChecker says there's a problem with a website that you're accredited by, PharmacyChecker is happy to help that person out because they stand by their accreditations that they make. And again, it is not- So what are the damages that you're seeking? Are you seeking lost revenue tied to these illegal sales? No, PharmacyChecker's seeking- What percentage is it legal? What percentage is illegal? There's nothing that's illegal, Your Honor. PharmacyChecker's revenue is based on click-throughs to pharmacies. Click-throughs to all pharmacies, whether that's U.S., foreign, or whatever. And by the way, there's no inescapable- If your connection to a foreign pharmacy with a U.S. customer resulted in illegal importation of a drug, you still want damages on that sale? Absolutely, Your Honor, absolutely. And by the way, the click-throughs, we only have numbers for one or two pharmacies, and those were numbers from pharmacies that were third-party subpoenas by the defendants. And those numbers show that maybe 3% of click-throughs result in a transaction. Now, by the way, only about 60% of PharmacyChecker's website visitors are U.S.-based users. We don't know whether those click-throughs lead to purchases that lead to imports, whether they could be buying drugs for shipping to their kids that are studying abroad. There's a lot of inferences and assumptions that are being made, and we're talking about summary judgment now. So were third-party subpoenas made to the 64 foreign pharmacies? They're not, I don't know if they were all 64. These were the defendant's subpoenas. There were subpoenas or letters of rogatory made to a number of them. Mr. Gott, I have a sort of preliminary question to you. Sure. It seems that you're arguing an issue that Judge Simon did not consider, whether there is any facilitation of illegal importation. His question was whether a plaintiff's alleged facilitation of unlawful activities by others bars its antitrust standing. Not whether your business did not facilitate illegal importation. So why don't you discuss the basis of Judge Simon's ruling? Well, the basis of Judge Simon's ruling is that they're, as well as- Assuming your business is facilitating illegal importation, you still have antitrust standing. You don't want to take that position? Absolutely want to take that position. Well, I thought so, but now's about the time to take it. And that's the point here, Your Honor. If I could, I'm going to engage in a little show and tell here. This is my son, Harrison. Harrison was not born when this case was filed. He was born in September of 2019. This case was filed in August of 2019. I missed the first hearing in this case, September 10th, 2019, because that was Harrison's birthday. He came about two weeks early. We're here today on a summary judgment, and we have yet to get into discovery on a defendant's anti-competitive conduct. Five years later, I just submitted his kindergarten enrollment, and we have yet to litigate antitrust issues in this antitrust case, because we've been focused on the alleged wrongful conduct of not even the plaintiff, but parties at the plaintiff. Okay, I'm sorry, counsel, but on the question, the legal question, the argument is that if your business is 100% illegal, that that would distinguish this case from all the other cases decided by the Supreme Court and this Court that said some illegality does not affect antitrust standing, or that the nature of the illegality here is different, because it's not a private illegality between the defendant and the plaintiff, or it's not in itself the antitrust illegality, but it's a whole, your business just cannot be. That's their argument, and they're saying, if a business cannot be, there's no antitrust injury. So can you address that argument? Well, I don't think you have to reach that question here, Your Honor, because that's not the case here. Now, I know this Court has reserved the question for the possibility where there's a completely illegal enterprise, where there's no saving grace whatsoever, whether or not that might be the one case where there's no antitrust cause of action. But here, Pharmacy Checker has plenty of lawful business, even if you were to assume that it's engaged in big F facilitation, and the mere practice of providing links was illegal. Pharmacy Checker is used by, its price comparisons are used by policymakers, by journalists, there are First Amendment concerns there. It has a U.S. pharmacy discount card that's used that helps patients save money. Its entire mission is driven towards helping people save money on pharmacy products. Mr. Gunn, you're arguing a case that Judge Simon hasn't certified to this Court. I'm sorry, Your Honor, but I believe you. If you don't win, then you have to go back. Why don't you argue the case that we have before us? I believe I am, Your Honor. Okay, thank you. I think it's right in the introduction of Judge Simon's. So I understand your argument about that your strong position is that Pharmacy Checker is not 100% illegal from the get-go. Let's put that aside for a second. Assuming that it is, how does that affect the antitrust standings, and I understand you're acknowledging that that remains an open question in this circuit. How should we answer it? Well, Your Honor, I think that you should answer it, that the antitrust laws, that the drug laws address the drug laws. The antitrust laws address the problem of competition, and competition is a public, competition under this Court's precedent and Supreme Court precedent. The antitrust laws reign supreme. There's no consideration for unsafe goods, compliance with other laws, or anything else. Under Kiefer-Stewart, Calnetics, Memorex, and all of the other cases that are cited in our brief from the Ninth Circuit and the Supreme Court, there is no, there's no place for a new rule that deprives a plaintiff of an antitrust cause of action, or that immunizes an antitrust defendant. When, based on the plaintiff's conduct, or based on the conduct of a third party, regardless of whether that conduct is entirely legal, entirely illegal, or not. Thank you, Your Honors. All right. Go ahead, please, with your rebuttal. Go ahead, please, with your rebuttal. Thank you, very briefly. I'll just make two points in rebuttal, Your Honors. Thank you for the opportunity. Excuse me. First of all, I can't believe I heard my esteemed opponent say that it's not illegal to import foreign drugs. It most certainly is. That's the Canadian antitrust litigation from the Eighth Circuit, and it's by statute as well. 21 U.S. Code 333, the Federal Food, Drug, and Cosmetic Act. And under 18 U.S. Code Section 2, aiding and abetting the Commission of Criminal Conduct, the aider and abetter is just as liable as the direct defendant. I mean, this is a case like the movie Casablanca. But Judge Karras. Sorry? Judge Karras, in New York, specifically found there was no criminal facilitation here, right? He didn't get to the, he didn't. No, he specifically said he was not making that finding. Your Honor, this is, first of all, you're not reviewing Judge Karras. Second of all, this is de novo review. This panel's perfectly entitled to examine that question and reach whatever conclusion it wishes. This is Judge Karras. Semantic similarity aside, the court at no point decided that pharmacy checkers itself violated federal law or that PCC engaged in something akin to criminal facilitation. It didn't reach the issue, in other words. If this court enunciates the correct standard, it can send the case back to Judge Simon and say, examine that. This is an instance like the movie Casablanca where you're shocked, just shocked, to find out that there's gambling going on at the cafe. Of course, that's the purpose of the website. The second point I would make is nobody has suggested, and we're not suggesting. Can you, do you have a case suggesting that, because Judge Simon found, Judge Simon found that there was, that the business was legal, at least from what I am looking here, and that let's assume some of the transactions are legal and some of them are illegal. You're saying because the purpose, pharmacy's alleged purpose is illegal, doesn't matter that some of the transactions it facilitates are legal. Do you have a case for that proposition? I do. The Wiley case, W-Y-L-E, that we have cited, I think it was our reply brief, said that basically in any event, an antitrust plaintiff could not recover damages from activities that are illegal, and Judge Simon himself alluded to this possibility in his comments from the bench. We cited to that in a footnote, the excerpts of record, a footnote in our opening brief, and also Judge Simon's certification of the question to this panel itself raises that possibility, because the second part of his question said, okay, if illegality is a metric, what proportion of the plaintiff's business has to be illegal before they have no standing? That was a little bit of a different question. You're not quite answering my question. My question was, if the website facilitates some transactions that are legal, and some that are illegal, you're saying the fact that some percentage of its business illegal means the entire business, from the get-go, its purpose must be illegal, that it essentially has no right to exist. That's what I understand your argument to be. Respectfully, Your Honor, it's a little bit beyond that. And again, I recognize that you are not reviewing Judge Karras' decision, but nevertheless, it's instructive. Judge Karras said the best metric, the best tracking metric to, first of all, he posited the standard is largely or entirely geared towards facilitating illegal conduct. That's what he posited as the test. And he said the best metric is tracking where the revenue comes from. And he found that the vast majority of pharmacy checkers' revenue came from these click-throughs and the payments from foreign pharmacies. And plainly, the foreign pharmacies wouldn't be paying money unless they got something out of it, what they get is the sales. So no one has ever said that the standard is it has to be 100% illegal. But what, you keep saying, well, any corporation or company would not pay for advertising unless it resulted in a sale. But what percentage of sales is resulting here? Like, that is a different standard for every company, right? No one is saying for every click-through, there must be 100% sale and importation of a drug. Otherwise, I'm not gonna expend the money to get the eyeballs. So what is the percentage here? Because you're asking us to make an assessment of the percentage of illegality of this enterprise. What is the sale? We or any corp. No, but you keep saying rely on common sense earlier. So what does common sense dictate in terms of the percentage of sales that results from the click-throughs? I would argue that logic and common sense track what Judge Karras said. He said the best way to measure that is where the revenue comes from. And if the revenue comes from foreign pharmacies, if X percent of the revenue- So what is the percentage of sales that result from the foreign pharmacy click-throughs? What does common sense tell us is that number? 60%, 59.6%. And where do you get that from? Because 85% of, I may be getting this inverted, but 70% of the payments to PharmacyChecker from pharmacies come from foreign pharmacies. 64 out of 71 of the pharmacies that pay them money are foreign. So as you are, there's a difference here between damages and standing. You're trying to rely on standing. So my understanding of your standing argument is that there's no standing here because PharmacyChecker as an entity is an illegal business. And that even though some of its transactions and some of its activities would be entirely legal, just providing information on the internet, just providing links to websites, technically all legal, that because it has an illegal purpose, we should find that the business should not exist as a lawful matter. Therefore, it has no possible legal injury for purposes of antitrust. That's your argument. Is that correct? That's one of my arguments. That's the argument I'm focusing on. Do you have a case that says a business that does some legal activity and some illegal activity should be deemed entirely illegal under somewhat analogous facts here? The first case that comes to mind is in fact Judge Karas's decision. There's something binding on this court. I'd have to go back and look and I'd be happy to submit a bench memo if that would be helpful. I don't think that would be helpful, but I'll ask my colleagues if they disagree. No? Judge Song, would you like? No, no thank you. Thank you for the offer though. All right, you've gone more than nine minutes over your time. Thank you very much for your arguments. Thanks to both counsel for your arguments today. This matter is now submitted and we're adjourned for the day. Thank you all. All rise.
judges: BEA, KOH, SUNG